## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STARR INTERNATIONAL COMPANY, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | Case No. 14-cv-01593 (CRC) |

| |
|---|
| **UNITED STATES OF AMERICA,**<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>**STARR INTERNATIONAL COMPANY, INC.,**<br><br>Counterclaim-Defendant. |

## <u>MEMORANDUM OPINION</u>

Foreign corporations owe U.S. federal income tax on dividend income received from sources within the United States. If that income is insufficiently connected to a foreign corporation's business activity in the United States, by statute it is taxed at a rate of 30%. 26 U.S.C. § 881(a). The United States maintains tax treaties with many countries, including Switzerland, which reduce this 30% statutory rate for foreign corporations that satisfy certain requirements set forth in the treaty. Our tax treaty with Switzerland also gives the Secretary of the Treasury or his designee discretion to grant Swiss companies benefits under the treaty even if they fail to meet the enumerated criteria. The central question presently before the Court is whether the Secretary's denial of discretionary treaty benefits in the form of a lower dividend tax rate is subject to judicial review.

Swiss-domiciled Starr International Company ("Starr") was once the largest shareholder of American International Group, Inc. ("AIG"). In 2007, Starr petitioned the Internal Revenue Service ("IRS") for discretionary benefits under the U.S.-Swiss tax treaty. After its request was denied, Starr filed this tax-refund suit to recover some $38 million that AIG had paid to the Treasury on its behalf in 2007—or, approximately half of Starr's withholdings on AIG dividends for that year. The Government has moved to dismiss the suit, asserting that the IRS's decision to deny Starr treaty benefits is not judicially reviewable because it is committed exclusively to the agency's discretion by the treaty and involves a nonjusticiable political question. The Government also asserts defenses based on the same grounds. Starr opposes the Government's motion to dismiss and moves to strike its defenses.

The Court finds that the Government has not met its burden to present clear and convincing evidence to overcome the presumption of judicial review of federal agency action. Because the treaty does not reflect an unambiguous intent to foreclose judicial review, and the Technical Explanation of the treaty—which the IRS followed here—supplies a meaningful standard for determining whether a Swiss company qualifies for treaty benefits, the Court may review whether the Secretary abused his discretion in not extending those benefits to Starr. The Court will, accordingly, deny the United States' motion to dismiss and grant Starr's motion to strike the Government's justiciability defenses.

## I.      Background

This dispute traces its roots to the heralded falling out between AIG and its then-CEO, Maurice R. Greenberg. See, e.g., Gretchen Morgenson, Chief Is Leaving Insurance Giant; Inquiries Mount, N.Y. Times (Mar. 15, 2005), http://www.nytimes.com/2005/03/15/business/chief-is-leaving-insurance-giant-inquiries-mount.html. Starr and AIG both originated from the restructuring of American Asiatic Underwriters, a multinational insurance company formed in 1919 by Cornelius

Vander Starr. Compl. ¶¶ 10–14.[1]  In the 1970s, Starr transferred its insurance business to AIG and became the largest holder of AIG common shares. Id. ¶ 17.  At that time, Greenberg was the chairman of both companies' boards of directors and the CEO of AIG. Id. ¶ 16.  For the next several decades, Starr used its massive holding of AIG common stock to fund discretionary compensation plans for AIG executives. Id. ¶ 28.  Starr also received dividends on those shares, which were, and continue to be, subject to a 30% federal withholding tax. Id. ¶ 18.

In 2004, Starr moved its headquarters from Bermuda to Ireland and began to take advantage of the 1997 U.S.-Ireland tax treaty, which automatically reduced Starr's withholding rate on AIG dividends by half. Id. ¶¶ 20–25.  No similar treaty benefit existed for companies headquartered in Bermuda. Am. Answer & Countercl. ("Counterclaim") ¶ 14.  The next year, amidst an investigation by New York's Attorney General, Greenberg stepped down as CEO of AIG, and Starr ceased funding AIG's executive-compensation plan. Compl. ¶¶ 26–29.  Starr would have continued to receive benefits under the U.S.-Ireland tax treaty had it not then relocated its headquarters to Switzerland, allegedly to protect its assets from an AIG lawsuit claiming that Starr was contractually obligated to fund the plan. Id. ¶ 31–33; see also Starr Int'l Co., v. AIG, 648 F. Supp. 2d 546 (S.D.N.Y. 2009).

Under the Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income, Oct. 2, 1996, S. Treaty Doc. No. 105-8 (1998) [hereinafter "the Convention" or "the treaty"], a Swiss company receiving dividends from a U.S. company is automatically entitled to halve its withholdings under certain enumerated circumstances, as when the Swiss company does significant business in Switzerland or

---

[1] The nonjurisdictional facts in this section are drawn from Plaintiff's complaint and Defendant's amended answer and counterclaim, to the extent not disputed by Plaintiff.  The Court assumes these facts to be true for purposes of deciding the present motions.

is listed on a recognized stock exchange. Id. arts. X, XXII.  If a company is not automatically entitled to benefits under the treaty, it "may, nevertheless, be granted the benefits of the Convention if the competent authority of the State in which the income arises so determines after consultation with the competent authority of the other Contracting State." Id. art. XXII(6).  The Department of the Treasury has analyzed the Convention in a so-called Technical Explanation, which explains that this limitation on treaty benefits was designed to prevent "treaty shopping"—the practice of moving, for example, to Switzerland specifically to benefit from the lower U.S. tax rate offered by the U.S.-Swiss tax treaty.  Dep't of the Treasury, Technical Explanation of the Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income 62–63, http://www.irs.gov/pub/irs-trty/swistech.pdf [hereinafter "Technical Explanation"].

In 2007, Starr requested tax benefits under the discretionary provision[2] of the Convention via a letter to the U.S. Competent Authority, the IRS Deputy Commissioner (International) of the Large and Mid-Size Business Division.  Countercl. ¶¶ 16–17, 19.  In doing so, Starr acknowledged that it was not entitled to treaty benefits under any of the enumerated, mandatory categories. Id. ¶¶ 17, 19.  In March 2010, not having received a response to its letter but wishing to reserve its right to a refund, Starr sent a 2007 tax-return form to the IRS Service Center in Ogden, Utah, contending that it had overpaid $38,181,246 in taxes—half of its withholdings on AIG dividends. Id. ¶ 20.  Starr did not mark the "protective return" box provided on the form, but it wrote "Protective Refund Claim" on the header. Id.  Starr forwarded the form to the IRS analyst working on its benefits request, who contacted the Utah Service Center to ensure that the refund was not

---

[2] This provision is informally known as the "discretionary provision." See Technical Explanation 72.  The Court's adoption of this terminology has no bearing on its analysis of whether decisions made under the provision are in fact committed to the IRS's discretion.

paid before Starr's treaty benefits had been determined. <u>Id.</u> ¶ 21. In October 2010, the U.S. Competent Authority denied Starr's request to apply the Convention to reduce Starr's 2007 withholding tax. <u>Id.</u> ¶ 22. Starr was, however, later issued a Convention-based refund for its 2008 taxes. <u>Id.</u> ¶¶ 45–46.

Starr brought suit in September 2014, claiming that the IRS had erroneously denied its request for benefits under the Convention. Starr contends that the IRS abused its discretion because (1) Starr was not treaty shopping when it relocated to Switzerland, (2) the IRS failed to consult with the Swiss Competent Authority before denying Starr's request, and (3) the IRS had no legal basis for issuing Starr a 2008 refund while denying its 2007 request based on the same material facts. Compl. ¶¶ 36–50. The IRS has raised two main defenses to Starr's claims: that the U.S. Competent Authority's decision is committed to agency discretion by law and, alternatively, that the Court lacks jurisdiction under the political-question doctrine.[3] The IRS has also moved to dismiss Starr's claims under those same defenses.[4] Starr has moved to strike the IRS's justiciability defenses, contending that the committed-to-agency-discretion exception to judicial review does not apply to tax-refund suits and that Starr's challenge does not raise an unreviewable political question. The Court held a hearing on the motions on May 12, 2015.

---

[3] The IRS has also asserted a counterclaim (one not currently before the Court) to recover the 2008 refund, asserting that Starr fraudulently procured it by failing to alert the Utah Service Center that the U.S. Competent Authority had denied Starr's earlier request for relief.

[4] Starr asks that the IRS's motion to dismiss be stricken because it was filed after the IRS's answer. The Court will instead convert the IRS's motion into one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). <u>E.g.</u>, <u>Langley v. Napolitano</u>, 677 F. Supp. 2d 261, 263 (D.D.C. 2010) (observing that courts routinely treat motions to dismiss that are filed after a responsive pleading as motions for judgment on the pleadings).

## II.       Standard of Review

The Court may strike insufficient defenses or "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "'The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion.' . . . However, a motion to strike is a drastic remedy that courts disfavor." Gates v. District of Columbia, 825 F. Supp. 2d 168, 169 (D.D.C. 2011) (quoting Naegele v. Albers, 355 F. Supp. 2d 129, 142 (D.D.C. 2005)). Such motions are granted "where it is clear that the affirmative defense is irrelevant and frivolous and its removal from the case would avoid wasting unnecessary time and money litigating the invalid defense." United States ex rel. Head v. Kane Co., 668 F. Supp. 2d 146, 150 (D.D.C. 2009) (quoting SEC v. Gulf & Western Indus., Inc., 502 F. Supp. 343, 344 (D.D.C. 1980)) (internal quotation marks omitted).

In response to a motion to dismiss a complaint for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must prove by a preponderance of the evidence that the court has jurisdiction. E.g., Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004). A court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). But a "court must give [the] plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." Byrum v. Winter, 783 F. Supp. 2d 117, 122 (D.D.C. 2011) (citing Macharia v. United States, 334 F.3d 61, 64, 69 (D.C. Cir. 2003)). In determining whether it has jurisdiction, a court "may consider materials outside of the pleadings." Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  While the court must "assume [the] veracity" of any "well-pleaded factual allegations" in the complaint, conclusory allegations "are not entitled to the assumption of truth." Id. at 679.

### III.    Analysis

Starr seeks a refund under 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1), which create a cause of action for the recovery of "erroneously or illegally assessed" taxes, claiming that the IRS abused its discretion in denying Starr benefits under the Convention.  Neither party questions that refund claims may be grounded in a tax-treaty provision.  Instead, the dispute here surrounds whether Starr's challenge to a particular IRS decision—one made under the discretionary provision contained in article XXII(6) of the Convention—is justiciable.  The Court must first decide whether the committed-to-agency-discretion exception to judicial review can apply to tax-refund suits or is limited to suits brought under the Administrative Procedure Act ("APA").  If that exception is not so limited, the Court must then determine whether the IRS's denial of benefits is nonjusticiable for lack of a meaningful legal standard.  Finally, the Court will independently assess whether the political-question doctrine precludes consideration of Starr's tax-refund suit.

### A.    Whether the Committed-to-Agency-Discretion Exception to Judicial Review Applies Beyond the Administrative Procedure Act

Before determining whether the committed-to-agency-discretion exception to judicial review bars this Court from hearing Starr's claims, the Court must decide whether the exception even applies to this case.  Starr has brought a claim under 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1), not the APA.  The committed-to-agency-discretion exception, however, is linked

closely to language in the APA, which states that agency action is generally reviewable "except to the extent that . . . [it] is committed to agency discretion by law." 5 U.S.C. § 701(a). Indeed, the IRS cites this provision of the APA in claiming that denials of tax benefits under the Convention are "committed to agency discretion by law." Countercl. 2. Starr rejoins that "[t]he limitations that the government seeks to impose on this Court's judicial review apply *only* to claims that are brought under the APA itself." Mem. Supp. Mot. Strike 9 (emphasis added). The question therefore becomes whether this exception is limited to suits under the APA, as Starr urges, or whether it may carry over to challenges to government action brought under other laws (specifically, the tax-refund statute). Because the APA provision is but one manifestation of this well-established exception to judicial review, the Court concludes that the exception is not limited to suits brought under the APA and that the IRS may thus attempt to invoke it in this case.

The APA does explicitly carve out an exception to judicial review for action that is committed to agency discretion by law. But this provision only "codifies 'traditional principles of nonreviewability.'" Oryszak v. Sullivan, 576 F.3d 522, 526 n.3 (D.C. Cir. 2009) (quoting Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 160 (D.C. Cir. 2006)). Under these principles, "a matter committed to agency discretion is not reviewable because courts lack judicially manageable standards by which to evaluate it." Id. (citing Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002)). For that reason, courts regularly apply the exception when plaintiffs challenge government action under other laws, not just the APA. See, e.g., Steenholdt v. FAA, 314 F.3d 633, 639 (D.C. Cir. 2003) (rejecting petitioner's contention that an exception to judicial review could not be applied to a challenge under the Federal Aviation Act). Thus, regardless of the statute that provides the basis for judicial review, courts may inquire into whether agency action is committed to agency discretion and is therefore unreviewable.

That still leaves the question of whether the exception may properly be applied in cases involving tax determinations by the IRS. A party may generally bring a refund claim based on a provision of a tax treaty, see, e.g., Del Commercial Properties, Inc. v. C.I.R., 251 F.3d 210, 213 (D.C. Cir. 2001) (reviewing a claim for benefits under the U.S.-Netherlands tax treaty), but cannot prevent a tax withholding through an APA suit, because pre-collection efforts to enjoin withholdings are barred by the Anti-Injunction Act, see, e.g., Int'l Lotto Fund v. Va. State Lottery Dep't, 20 F.3d 589, 591 (4th Cir. 1994). Starr contends that the IRS cannot have its cake and eat it too: If a party cannot challenge an IRS determination under the APA, Starr argues, then the IRS should not be able to interpose defenses grounded in the APA in a tax-refund suit. While this argument may appeal in its symmetry, it runs counter to prior case law.

Other courts have considered the committed-to-agency-discretion exception in the context of tax disputes not brought under the APA. Specifically, courts have applied the exception—and found judicial review unavailable—in interest-abatement suits, wherein taxpayers sought reductions in interest on late taxes by arguing that the IRS caused any delays. E.g., Selman v. United States, 941 F.2d 1060, 1061 (10th Cir. 1991) (citing 26 U.S.C. § 6404 (1988)). These cases, which involved causes of action separate and apart from the APA, clarify that even if the APA is not the *source* of this exception to judicial review, it at least "provides the *framework* for determining when a court may review a decision of an agency"—even when plaintiffs bring their claims under another law. Horton Homes, Inc. v. United States, 936 F.2d 548, 550 (11th Cir. 1991) (emphasis added); accord Argabright v. United States, 35 F.3d 472, 476 (9th Cir. 1994); Selman, 941 F.2d at 1064.[5]

---

[5] Although Congress overturned this line of cases through a statutory amendment that made abatement mandatory (rather than discretionary) in certain circumstances, the Supreme Court has recognized that these decisions accurately interpreted the earlier statute that had provided for discretionary abatement. See Hinck v. United States, 550 U.S. 501, 507 (2007) (citing with

These interest-abatement cases therefore demonstrate that the committed-to-agency-discretion exception to judicial review may apply to challenges to IRS decisionmaking not brought under the APA, whether in the form of interest-abatement suits or tax-refund suits.[6]

Tax Analysts & Advocates v. Shultz, 376 F. Supp. 889 (D.D.C. 1974), on which Starr relies to argue that an IRS decision to deny tax-treaty benefits must be judicially reviewable, is not to the contrary. There, an interest group challenged an IRS revenue ruling related to gift-tax treatment of contributions to political campaigns, and the IRS claimed that its ruling was committed to the sole discretion of the agency unless challenged by a taxpayer in a refund suit. Id. at 894–95. Acknowledging that "the 'committed to agency discretion' exclusion is[] 'a very narrow exception,'" id. at 895 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971)), the court rejected the IRS's position because it "cited no law which commits IRS action to IRS discretion," id. Tax Analysts thus held that the committed-to-agency-discretion exception to judicial review does not categorically apply to *all* IRS decisions, but it did not foreclose the possibility that the exception could apply to some IRS decisions.

B.     Whether the IRS's Determination Is Committed to Agency Discretion

Having found that the committed-to-agency-discretion exception to judicial review may be invoked in tax-refund suits, the Court must determine whether the Convention at issue here in fact

---

approval Argabright, 35 F.3d at 476, as noting an absence of "judicially manageable standards" to review abatement decisions under the prior statute).

[6] Starr contends that this line of cases is inapposite because an interest-abatement suit is fundamentally different from a tax-refund suit. Reply Supp. Mot. Strike 3–4 (quoting Beall v. United States, 336 F.3d 419, 423 (5th Cir. 2003)). But this is a distinction without a difference. Indeed, in many abatement cases, the plaintiffs had already paid the tax and were seeking an abatement after the fact through a refund suit. Selman, 941 F.2d at 1061; Horton Homes, 936 F.2d at 550. Regardless, these decisions all illustrate that courts generally accept that the committed-to-agency-discretion exception to judicial review may apply to challenges to IRS decisionmaking, even when plaintiffs do not bring claims under the APA.

precludes judicial review. An action is committed to agency discretion if the applicable provision

of law "is drawn so that a court would have no meaningful standard against which to judge the

agency's exercise of discretion," Heckler v. Chaney, 470 U.S. 821, 830 (1985), or "in those rare

instances where 'statutes are drawn in such broad terms that in a given case there is no law to

apply,'" Citizens to Preserve Overton Park, 401 U.S. at 410 (quoting S. Rep. No. 752, at 26 (1945)),

abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). This exception is

construed narrowly because there is a "strong presumption that Congress intends judicial review of

administrative action."[7] Amador Cnty. v. Salazar, 640 F.3d 373, 379 (D.C. Cir. 2011) (quoting

Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986)) (internal quotation marks

omitted). "Absent an express statutory prohibition on judicial review, courts have been extremely

hesitant to find such a bar." Id. And "[t]he mere fact that a statute grants broad discretion to an

agency does not render the agency's decision completely nonreviewable under the 'committed to

agency discretion by law' exception unless the statutory scheme, taken together with other relevant

materials, provides *absolutely no guidance* as to how that discretion is to be exercised." Beverly

Health & Rehab. Servs., Inc. v. Thompson, 223 F. Supp. 2d 73, 89–90 (D.D.C. 2002) (emphasis

added) (quoting Robbins v. Reagan, 780 F.2d 37, 45 (D.C. Cir. 1985)).

To determine whether judicial review of a particular agency action is unavailable, courts

consider "the nature of the administrative action at issue," Twentymile Coal Co., 456 F.3d at 156

---

[7] Case law analyzing the reviewability of agency action typically takes congressional intent to be its guiding principle. But treatymaking requires the input of the executive branch, the Senate, and a negotiating counterparty. U.S. Const. art. II, § 2. Their collective intent controls here, as treaty interpretation is "normally . . . a matter of determining the parties' intent." BG Grp., PLC v. Republic of Argentina, 134 S. Ct. 1198, 1208 (2014). Federal courts "should normally apply the [background] presumptions supplied by American law" when ascertaining treatymakers' intent in assessing entitlement to relief under a federal statute. Id. One such presumption—an especially strong one—is that Congress intends for agency action to be reviewable.

(citation omitted), as well as the "language, structure, and history" of the statute or treaty that supplies the applicable legal standards for reviewing that action, NLRB v. United Food & Commercial Workers Union, Local 23, AFL-CIO, 484 U.S. 112, 130 (1987). The burden rests on the party seeking to limit access to the courts to show by clear and convincing evidence an intent to limit judicial review. Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). One way to show the unavailability of judicial review is to demonstrate that there is "no law to apply." Citizens to Preserve Overton Park, 401 U.S. at 410. After all, "[i]f no 'judicially manageable standard' exists by which to judge the agency's action, meaningful judicial review is impossible and the courts are without jurisdiction to review that action." Steenholdt, 314 F.3d at 638 (citing Heckler, 470 U.S. at 830). The D.C. Circuit has held, however, that even an "agency's policies [can] provide[] standards rendering what might arguably be unreviewable agency action reviewable." Clifford v. Peña, 77 F.3d 1414, 1417 (D.C. Cir. 1996). Because the IRS has not met its burden to show by clear and convincing evidence an intent to limit judicial review, and because the IRS Technical Explanation supplies sufficient "law to apply," the Court finds that the decision to withhold treaty benefits is not committed to agency discretion and that it may therefore review such a decision.

### 1.   Agency Action That Is Presumptively Unreviewable

The nature of the challenged action is particularly important in assessing reviewability because courts presume that certain categories of agency decisionmaking are unreviewable. The more prominent presumptive categories—prosecution or enforcement decisions, Wayte v. United States, 470 U.S. 598, 607 (1985), and expenditures from a lump-sum appropriation, Lincoln v. Vigil, 508 U.S. 182, 192 (1993)—are inapplicable here. The IRS contends that the presumption of unreviewability should nonetheless apply because the discretionary provision calls for "executive branch decision[s] involving complicated foreign policy matters." Legal Assistance for Vietnamese

12

Asylum Seekers v. Dep't of State, 104 F.3d 1349, 1353 (D.C. Cir. 1997).  But the foreign-policy presumption is rarely used and applies only when an agency decision requires "balancing complex concerns involving security and diplomacy resources."  Id. (holding that the State Department's decision to deny a consular visa was committed to agency discretion); see also U.S. Ordnance, Inc. v. Dep't of State, 432 F. Supp. 2d 94, 98 (D.D.C. 2006) (holding that a delegation of authority to control arms exports was not reviewable), vacated as moot, 231 F. App'x 2 (D.C. Cir. 2007).  As explained below in the Court's discussion of the political-question doctrine, reviewing a denial of benefits under the discretionary provision does not involve "second-guessing executive branch decision[s] involving complicated foreign policy matters."  Legal Assistance for Vietnamese Asylum Seekers, 104 F.3d at 1353.  Starr has asked the Court merely to interpret conventional legal materials.  To the extent that the foreign-policy presumption and the political-question doctrine have different analytical underpinnings, the Court finds the presumption inapplicable here.

### 2.    Intent To Preclude Judicial Review

Having found that the discretionary provision of the Convention is not categorically nonjusticiable, the Court turns to its "language, structure, and history."  United Food & Commercial Workers Union, 484 U.S. at 130.  "The interpretation of a treaty, like the interpretation of a statute, begins with its text."  Abbott v. Abbott, 560 U.S. 1, 10 (2010) (quoting Medellín v. Texas, 552 U.S. 491, 506 (2008)).  The discretionary provision states that

> [a] person that is not entitled to the benefits of this Convention pursuant to the provisions of the preceding paragraphs may, nevertheless, be granted the benefits of the Convention if the competent authority of the State in which the income arises so determines after consultation with the competent authority of the other Contracting State.

U.S.-Swiss Tax Treaty art. XXII(6).  By itself, this provision leaves the Court with little to latch onto.  It uses the language of open-ended permission rather than command.  The treaty text alone, then, leaves entirely open what the Competent Authority may consider when she "so determines"

13

whether to grant or deny benefits.  Such broadly permissive language may indicate an intent to render agency action unreviewable.  See, e.g., Steenholdt, 314 F.3d at 638 (finding unreviewable a provision stating that "[t]he Administrator may rescind a delegation under [the relevant act] at any time for any reason the Administrator considers appropriate" (quoting 49 U.S.C. § 44702)); Claybrook v. Slater, 111 F.3d 904, 909 (D.C. Cir. 1997) (concluding that language authorizing an agency to reach a decision based on its "determin[ation]" indicates unreviewable discretion) (citing Webster v. Doe, 486 U.S. 592, 600 (1988)).

Many statutes, however, afford agencies significant autonomy while remaining subject to judicial review.  See, e.g., Amador Cnty., 640 F.3d at 380–81 (rejecting that certain decisions were committed to agency discretion simply "[b]ecause Congress used 'may' instead of 'shall'").  Permissive language alone may not be not enough to demonstrate that a decision has been committed to agency discretion, because "[o]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."  Abbott Labs., 387 U.S. at 141.  Without such clear and convincing evidence, "the general presumption favoring judicial review of administrative action is controlling."  Block v. Community Nutrition Inst., 467 U.S. 340, 351 (1983).  The IRS does not claim that the discretionary provision *explicitly* precludes judicial review; it is simply a broadly worded grant of authority.  Accordingly, the Court must consider sources other than the Convention's text to determine whether the IRS has clearly and convincingly shown that judicial review is inappropriate here.

Along with a provision's language, courts consider the law's overall structure and history in determining whether the committed-to-agency-discretion exception applies.  United Food & Commercial Workers Union, 484 U.S. at 130.  Neither Starr nor the IRS considers the discretionary provision in a vacuum:  Both also look to the Treasury Department's Technical Explanation of the Convention.  Technical explanations are created by the Treasury Department during treaty

negotiations and presented to the Senate for consideration during the ratification process. See

Xerox Corp. v. United States, 41 F.3d 647, 655 (Fed. Cir. 1994) (describing the Technical

Explanation of the U.S.-U.K tax treaty). In essence, technical explanations serve as an analogue to

legislative history for treaty ratification, and courts properly consult these explanations when

construing treaty language. See Haver v. C.I.R., 444 F.3d 656, 658 (D.C. Cir. 2006) (relying on a

technical explanation in interpreting provisions of the U.S.-German tax treaty).

Here, the Technical Explanation provides that the

> [discretionary] provision is included in recognition of the fact that, with the increasing scope and diversity of international economic relations, there may be cases where significant participation by third country residents in an enterprise of a Contracting State is warranted by sound business practice or long-standing business structures and does not necessarily indicate a motive of attempting to derive unintended Convention benefits.

Technical Explanation 72. In other words, the treaty is designed to ensure that legitimate Swiss and

U.S. businesses do not pay full taxes in both countries, while also preventing companies from

"treaty shopping" by changing their citizenship purely to obtain preferential tax treatment. Id. at

59–60. The Technical Explanation thus clarifies, to a large degree, the applicable legal standard

when the Secretary of the Treasury evaluates a claim for benefits under the discretionary provision.

Specifically, the Treasury Department informed the Senate that it would "base [its] determination

. . . on whether the establishment, acquisition, or maintenance of the person seeking benefits under

the Convention, or the conduct of such person's operations, has or had as one of its principal

purposes the obtaining of benefits under the convention." Id. at 72. The Technical Explanation,

which was transmitted to the Senate before it consented to the Convention, thus put the Senate on

notice of how the IRS would endeavor to exercise its authority under the discretionary provision.

So too did the testimony offered to the Senate Foreign Relations Committee by the Treasury

Department's Deputy Assistant Secretary for International Tax Affairs. According to this Treasury

official, when implementing the discretionary provision, the IRS would seek to determine whether entities "can establish a substantial non-treaty-shopping motive for establishing themselves in their country of residence." Mem. Supp. Mot. Dismiss 9 (quoting Bilateral Tax Treaties and Protocol: Hearing Before the S. Comm. on Foreign Relations, 105th Cong. 354 (1997) (Statement of Joseph Guttentag, Deputy Asst. Sec., Int'l Tax, Dep't of Treas.). Moreover, the IRS effectively acknowledged in its formal letter denying Starr's refund for the 2007 tax year that it relies on the standard described in the Technical Explanation to make determinations under the discretionary provision. See Letter from Michael Danilack, U.S. Competent Auth. Deputy Comm'r (Int'l), to Bertil Lunquist, Starr Gen. Counsel (Oct. 13, 2010), Admin. R. at USCA0866. In that letter, the IRS explained that it could not "conclude that obtaining treaty benefits was not at least one of the principal purposes for moving Starr's management, and therefore its residency, to Switzerland." Id. And although the Technical Explanation's "principal purpose" language is not part of the Convention itself, the Senate was informed that the IRS would apply this test whenever it made a determination under the discretionary provision. The Senate, then, likely did not intend to allow the IRS to grant or deny benefits willy nilly. Rather, the Convention enables courts to review the IRS's actions against a coherent legal benchmark: the "principal purpose" test.

Other than the discretionary provision's permissive language, the only evidence indicating an intent to preclude judicial review is one sentence in a Senate report describing the discretionary provision as "a portion of the qualified resident definition . . . under which the Secretary of the Treasury may, in his sole discretion, treat a foreign corporation as a qualified resident of a foreign country[.]" Tax Convention with Switzerland, S. Exec. Rep. No. 105-10, at 54 (1997). This lone statement does not explicitly discuss judicial review, but it nonetheless provides some evidence of an intent to preclude such review. That being said, because the history of the Convention sends mixed messages about whether the treatymakers intended decisions under the discretionary

provision to be reviewable, the Court finds that the IRS has not presented clear and convincing evidence that the discretionary provision was intended to preclude judicial review. Indeed, the structured guidance set forth in the Technical Explanation—along with the lack of any express preclusion of judicial review—renders the issue sufficiently ambiguous that the presumption of reviewability controls.

3.    The Existence of Judicially Manageable Standards for Review

Even when the bare statutory text contains no judicially manageable standards, an agency itself—by supplying a list of factors to guide its determination—may provide standards for judicial review of highly discretionary agency action. Clifford, 77 F.3d at 1417. The D.C. Circuit has taken an expansive view of what agency documents can provide courts with standards for review, even going so far as to consider documents generated well after the passage of the relevant statute. Specifically, the D.C. Circuit has held that an "agency's policies [can] provide[] standards rendering what might arguably be unreviewable agency action reviewable." Id. In Clifford, the government argued that the Maritime Administration's decisions to grant certain kinds of waivers were unreviewable because the "words of the statute [granting this authority] appear unrestricted and undefined," meaning that there would be no law to apply. Id. The statute in Clifford was drawn even more broadly than the treaty provision at issue here: "Under special circumstances and for good cause shown, the Secretary of Transportation *may, in his discretion*, waive [certain statutory] provisions . . . ." Id. (quoting 46 U.S.C. app. § 1222(b)) (emphasis added). The Court found, however, that "over the years the Maritime Administration had supplied a list of factors to guide its . . . judgment," and that these factors provided a measurable legal standard to guide judicial review. Id. According to the D.C. Circuit, therefore, when an agency articulates standards to guide its exercise of broad and discretionary authority—whether before or after ratification, all at once or piecemeal—those standards may adequately guide courts reviewing agency action. Here,

the IRS has supplied a standard to control its exercise of authority under the discretionary provision, which would "render[] what might arguably be unreviewable agency action reviewable" under the Clifford standard. 77 F.3d at 1417.

Although the Convention does not expressly preclude judicial review, the discretionary provision may still be nonjusticiable if any standards the court might apply are so broad and vague that judicial review would be "conceptually equivalent to . . . no review at all." Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993). While the discretionary provision says that the Competent Authority "may" grant benefits if she "so determines"—a rather amorphous test—the Technical Explanation elaborates that she "*will* base a determination . . . on whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention." Technical Explanation 72 (emphasis added). The IRS claims that this standard is not specific enough to permit review. What, asks the IRS, does it mean to conclude that a company's "principal purpose" is to obtain the benefits of a tax treaty?

The Court is not so daunted by the prospect of reviewing the IRS's determinations. Courts routinely face somewhat amorphous and open-ended standards. For instance, the D.C. Circuit has held that the phrase "in the interests of justice" provides sufficient guidance to allow at least some minimal judicial review. Dickson v. Sec. of Defense, 68 F.3d 1396, 1399 (D.C. Cir. 1995). Indeed, the discretionary provision would not be the first principal-purpose test that a court confronted. See, e.g., City of Columbus v. C.I.R., 112 F.3d 1201, 1204 (D.C. Cir. 1997) (analyzing a Treasury Department regulation that defined an "investment-type property" as "a prepayment for property or services . . . if a *principal purpose* for prepaying is to receive an investment return from the time the prepayment is made until the time payment otherwise would be made" (emphasis added)); Am. Fed'n of Labor and Congress of Indus. Orgs. v. Donovan, 757 F.2d 330, 345 (D.C. Cir. 1985)

(concluding that the Service Contract Act "applies only when the *principal purpose* of a contract is for services" (emphasis added)). At the margins, it may be difficult to determine whether a company moved to Switzerland principally to lower its tax rate. But this does not mean there are no manageable standards to apply.

Put simply, the committed-to-agency-discretion exception to judicial review is extremely narrow where, as here, no presumption of unreviewability applies. And the Technical Explanation provides meaningful standards—namely, whether an applicant's principal purpose was treaty shopping—that enable a court to determine whether the IRS abused its discretion in denying treaty benefits. Because this inquiry is not directionless, denials of tax benefits under the discretionary provision are not committed to the IRS's unreviewable discretion.

C.        Whether This Case Is Nonjusticiable Under the Political-Question Doctrine

The IRS also contends that the Court may not review the U.S. Competent Authority's decision to deny Starr benefits under the Convention because to do so would run afoul of the political-question doctrine. That doctrine, like the committed-to-agency-discretion principle, is a "narrow exception" to federal courts' duty to decide cases properly before them. Zivotofsky ex rel. Zivotofsky v. Clinton, 132 S. Ct. 1421, 1427 (2012). As did the petitioner in Zivotofsky, Starr requests only that a court "enforce a specific statutory right." Id. To be sure, determining whether the IRS "erroneously or illegally" deprived Starr of benefits under the discretionary provision, 28 U.S.C. § 1346(a)(1), would require the Court to parse the text of an international agreement. But "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Baker v. Carr, 369 U.S. 186, 211 (1962). Unsurprisingly, then, "courts have the authority to construe treaties" in the course of resolving otherwise-proper cases or controversies. Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986).

The Supreme Court has recently explained that a political question exists "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" Zivotofsky, 132 S. Ct. at 1427 (quoting Nixon v. United States, 506 U.S. 224, 228 (1993)); see also Hourani v. Mirtchev, Nos. 13-7088, 13-7089, 2015 WL 4590324, at *5 (D.C. Cir. July 31, 2015) (mentioning only these two factors in describing the political-question doctrine). This Court has already determined that the discretionary provision—read in conjunction with the Technical Explanation— provides a sufficiently manageable standard for judicial review. That being so, the propriety of denying claimants' requests for benefits under the Convention is also not committed to the Executive's unfettered discretion. Cf. Nixon, 506 U.S. at 228–29 ("[T]he lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch."). Because neither political-question factor is present here, this case is fully justiciable.

The IRS contends that judicial review under the discretionary provision's consultation requirement would impinge on the Executive's allegedly exclusive authority to "formulate and implement foreign policy." Def.'s Mot. Dismiss 32. But that requirement is not presently implicated, because the Convention does not condition the *denial* of treaty benefits on a prior consultation with Swiss officials. The relevant Treasury official need "consul[t] with the competent authority of the other Contracting State" only when a claimant would be "*granted* the benefits of the Convention." U.S.-Swiss Tax Treaty art. XXII(6) (emphasis added). In a properly presented case challenging the conferral (rather than the denial) of benefits under the discretionary provision, the Court might well question its authority to instruct an executive-branch employee to consult with the agent of a foreign sovereign. At present, though, that constitutional issue remains an abstract one. The Court therefore declines to consider it.

In its seminal (if dated) distillation of the political-question doctrine, the Supreme Court in Baker v. Carr listed six considerations "[p]rominent on the surface of any case held to involve a political question." Baker, 369 U.S. at 217. The first two were examined above; it is unclear whether factors three through six remain relevant after the Supreme Court's restrictive formulations in Nixon, 506 U.S. at 228, and Zivotofsky, 132 S. Ct. at 1427. To the extent that these latter factors might continue to inform the political-question doctrine, the Court will address them. Under Baker, the following circumstances also weigh in favor of nonjusticiability:

> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Baker, 369 U.S. at 217. As demonstrated above, the decision to award or deny tax-treaty benefits does not require policy determinations or diplomatic value judgments. Assessing litigants' entitlement to relief under federal law is, rather, "a familiar judicial exercise." Zivotofsky, 132 S. Ct. at 1427. Nor is this uncharted judicial territory. See, e.g., Xerox Corp., 41 F.3d at 660 (determining benefits under the U.S.-U.K. tax treaty). Moreover, concluding that the IRS abused its discretion here would not unduly disrespect a coordinate branch of government or embarrass the federal government as a whole. Otherwise, the entire enterprise of ensuring that administrative agencies conform to statutory requirements might transcend the judicial role. And even assuming that courts may appropriately discern whether individual political-branch decisions merit "unquestioning adherence," Baker, 369 U.S. at 217, tax-refund determinations do not fit that description.

Courts have properly refused to gauge such matters as "the wisdom of retaliatory military action taken by the United States," El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836, 851

(D.C. Cir. 2010) (en banc), and "the reasonableness of the Executive Branch's decision to seek . . . a change in the makeup of a foreign sovereign," <u>Schneider v. Kissinger</u>, 310 F. Supp. 2d 251, 258–59 (D.D.C. 2004), <u>aff'd</u>, 412 F.3d 190 (D.C. Cir. 2005).  Starr asks this Court to decide a far less weighty—and fundamentally legal—question: whether the IRS misinterpreted federal law in denying it a tax refund under the Convention.  This is a justiciable issue, and the Court will deny the IRS's motion to dismiss on political-question grounds.

## IV.   Conclusion

For the reasons stated above, the Court will grant in part and deny in part Starr's motion to strike and the IRS's motion to dismiss.  It will dismiss Starr's claim that the IRS violated the Convention by failing to consult with the Swiss Competent Authority, but deny the motion to dismiss Starr's claim in all other respects.  And it will strike the IRS's justiciability defenses.  An appropriate Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:    September 18, 2015

22