**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**STARR INTERNATIONAL COMPANY, INC.,**

        Plaintiff,

        v.

**UNITED STATES OF AMERICA,**

        Defendant.

Case No. 14-cv-01593 (CRC)

**UNITED STATES OF AMERICA,**

        Counterclaim-Plaintiff,

        v.

**STARR INTERNATIONAL COMPANY, INC.,**

        Counterclaim-Defendant.

## Table of Contents

I.   **Background** ................................................................................................3

    A.   Statutory Background ................................................................................3

    B.   Starr's History, Corporate Structure, and Previous Relocations .....................7

    C.   Starr's Move to Switzerland.........................................................................9

    D.   Starr's Request for Treaty Benefits Under Article 22(6)..............................12

    E.   Administrative and Procedural History ......................................................14

II.  **Legal Standards** ........................................................................................16

III. **Analysis** ...................................................................................................17

    A.   The Proper Legal Standard for Awarding Treaty Benefits Under Article 22(6)............18

       1.   *Starr's Third-Country-Resident Argument* ............................................18

       2.   *Starr Misunderstands the Technical Explanation's Conception of "Residency"* .....20

       3. *If It Were Valid, Starr's Third-Country Rule Would Be a Mechanical Test; It Is Not* ...........................................................................................23

       4. *Starr's Test Clashes With the Nature of Article 22's Discretionary Provision and Its Overriding Purpose* ...............................................................25

       5. *Starr's Test Would Result In a Cramped Conception of Treaty Shopping* ...............27

   B. The Competent Authority's Application of the Article 22(6) Standard .........................30

       1. *Whether Certain, Purportedly Key Evidence Required a Contrary Result* ..............31

       2. *Whether the Competent Authority's Analysis Rested on Irrelevant or Incorrect Determinations* ........................................................................................33

**IV. Conclusion** ........................................................................................................................37

## MEMORANDUM OPINION

The bilateral tax treaty between the United States and Switzerland entitles Swiss-resident entities to a reduction in the tax rate applied to dividends they receive from U.S. sources, provided they meet one of a dozen or so objective criteria enumerated in the treaty. If none of the listed requirements are satisfied, the Internal Revenue Service may still authorize a lower rate if it determines that the Swiss entity was not established for a "principal purpose" of obtaining treaty benefits. These rules are designed to limit treaty benefits to applicants that have a sufficiently strong business or geographic connection to Switzerland.

Swiss-domiciled Starr International Company, Inc. ("Starr"), was once the largest shareholder of the insurance giant AIG. In 2007, Starr, which did not meet any of the treaty's objective criteria for benefits, petitioned the IRS for a discretionary reduction in the rate applied to some $191 million in dividends that Starr received from AIG during the 2007 tax year. After a lengthy period of discussions between the two sides, the IRS ultimately denied Starr's request for treaty benefits on the ground that Starr's historical selection of domiciles and its then-recent relocation to Switzerland were motivated as much by tax reasons as by independent business

purposes. A "primary purpose" of the move, the IRS thus concluded, was to obtain treaty benefits.

Starr now challenges the IRS's denial of treaty benefits as arbitrary and capricious under the Administrative Procedure Act. Starr's primary contention is that the treaty's primary purpose test is designed to prevent the practice of "treaty shopping" and that the IRS applied an erroneous definition of that term in concluding that the company's relocation to Switzerland was largely tax-driven. Starr argues that "treaty shopping" is a precise legal term, covering only those instances where an on-paper resident of a country *not* party to the relevant tax treaty uses an entity that *is* an on-paper resident of a treaty country in order to obtain treaty benefits. Because Starr and its subsidiaries were on-paper Swiss residents and the majority of its voting shareholders were U.S. citizens at the relevant time, Starr says it could not have been "treaty shopping" under this definition. Starr's legalistic conception of "treaty shopping," however, cannot be squared with the text of the U.S.-Swiss treaty or its accompanying agency guidance. Instead, those authorities understand "treaty shopping" as encompassing situations where an entity establishes itself in a treaty jurisdiction with a "principal purpose" of obtaining treaty benefits. Because the IRS reasonably applied that standard in denying treaty benefits to Starr, the Court declines to set aside its determination.

## I.    Background

### A.    Statutory Background

When foreign corporations receive dividends from U.S. sources, that income is generally taxed at a 30% rate. 26 U.S.C. § 881(a)(1). To avoid double taxation and encourage cross-border investments, the United States has entered into numerous bilateral tax treaties with other nations. As a general matter, these treaties feature a reciprocal reduction in the tax rate on

foreign-source income for domestic residents of the contracting countries.  For example, the treaty at issue here, which the Court will refer to as the "U.S.-Swiss Treaty," reduces the tax on U.S.-source dividend income for Swiss residents from 30% to 5% or 15%, depending on the Swiss entity's percentage of ownership in the U.S. corporation.  <u>See</u> Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income art. 10(2), Oct. 2, 1996, S. Treaty Doc. No. 105–8, https://www.irs.gov/pub/irs-trty/swiss.pdf [hereinafter "Treaty"].

Bilateral tax treaties, including the U.S.-Swiss Treaty, thus aim to benefit residents of the two contracting states.  But this "begs the question of who is to be treated as a resident of a Contracting State for the purpose of being granted treaty benefits."  Dep't of the Treasury, Technical Explanation of the Convention Between the United States of America and the Swiss Confederation for the Avoidance of Double Taxation with Respect to Taxes on Income 59, http://www.irs.gov/pub/irs-trty/swistech.pdf [hereinafter "Technical Explanation"].[1]  The U.S.-Swiss Treaty generally defines residency based on local tax liability:  If a person "is liable to tax . . . by reason of his domicile" or the like, that person is a resident of the taxing jurisdiction.  Treaty art. 4(1)(a).  However, "[t]he fact that a person is determined to be a resident of a Contracting State [under the treaty's definition] does not necessarily entitle that person to the benefits of the Convention."  Technical Explanation 10.  As the treaty framers recognized, if on-paper residency were enough to obtain treaty benefits, then it would be easy to skirt the system:

---

[1] Technical explanations are created by the Treasury Department during treaty negotiations and presented to the Senate for consideration during the ratification process.  <u>See</u> <u>Xerox Corp. v. United States</u>, 41 F.3d 647, 655 (Fed.Cir.1994).  They serve as an analogue to legislative history for treaty ratification, and courts properly consult these explanations when construing treaty language.  <u>See, e.g.</u>, <u>Haver v. Commissioner</u>, 444 F.3d 656, 658 (D.C. Cir. 2006).

Any company—no matter its actual jurisdictional or geographic ties, or the location or identity of its true beneficiaries—could simply establish itself or a subsidiary entity in one of the treaty nations, and obtain treaty benefits. That company, in other words, could easily engage in treaty shopping.

Enter "Limitation on Benefits" provisions. Common among bilateral tax treaties, and housed in Article 22 of the U.S.-Swiss Treaty, these provisions aim to deny treaty benefits to those who establish "legal entities . . . in a Contracting State with a principal purpose to obtain [treaty] benefits." Technical Explanation 59. Of course, unlike determining on-paper residency, divining an entity's "principal purpose" for establishing itself in a particular jurisdiction is no easy task. Indeed, "it requires the tax administration to make a subjective determination of the taxpayer's intent." Technical Explanation 59. To ease "the administrative burdens of such an approach," id., Article 22 spells out a number of objective, mechanical tests meant to identify those treaty-country residents who are worthy recipients of treaty benefits. Generally, these mechanical tests seek to identify entities with legitimate, non-tax-related motives (such as business purposes) for their claimed state of residency: "The assumption underlying each of [Article 22's mechanical] tests is that a taxpayer that satisfies the requirements of any of the tests probably has a real business purpose for the structure it has adopted, or has a sufficiently strong nexus to the other Contracting State[.]" Technical Explanation 59. The idea is that, in order to obtain treaty benefits, the entity's "business purpose or connection [should] outweigh[] any purpose to obtain [treaty] benefits." Id.

Paragraph 1 of Article 22, for instance, provides that "a person that is a resident of a Contracting State and that derives income from the other Contracting State may only claim the benefits provided for in this Convention where such person" falls into one of seven categories.

Treaty art. 22(1).  Those categories include an "individual," id. art. 22(1)(a); an entity "engaged in the active conduct of a trade or business in the . . . Contracting State" where it is a resident, if the income it derives is connected to that trade or business, id. art. 22(1)(c); and a "family foundation resident of Switzerland, unless the founder, or the majority of the beneficiaries, are persons who are not [individuals] entitled to [treaty] benefits . . . or 50 percent or more of the income of the family foundation could benefit persons who are not [individuals] entitled to [treaty] benefits," id. art. 22(1)(g).  These criteria are proxies for intent:  The treaty drafters appreciated that individuals who actually live in Switzerland, who engage in an active trade or business in Switzerland, or who set up a Swiss family foundation in Switzerland (primarily to benefit Swiss individuals), probably are not residents of Switzerland because they want lower tax rates on their U.S.-source income.

The drafters also recognized, however, that certain entities with legitimate reasons for residing in a treaty nation might nevertheless fail Article 22's rigid mechanical tests.  See Technical Explanation 60 ("[T]hese mechanical tests cannot account for every case in which the taxpayer was not treaty shopping.").  Accordingly, in paragraph 6 of the Article, the treaty leaves open the possibility for discretionary relief:

> A person that is not entitled to the benefits of this Convention pursuant to the provisions of the preceding paragraphs may, nevertheless, be granted the benefits of the Convention if the competent authority of the State in which the income arises so determines after consultation with the competent authority of the other Contracting State.

Treaty art. 22(6).  The Technical Explanation indicates that "[w]hile an analysis under paragraph 6 may well differ from that under one of the other tests of Article 22, its objective is the same: to identify investors whose residence in the other State can be explained by factors other than a

purpose to derive treaty benefits." Technical Explanation 60. The Technical Explanation elaborates that

> [t]he competent authority of a State will base a determination under [the discretionary provision] on whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention. Thus, persons that establish operations in one of the States with a principal purpose of obtaining the benefits of the Convention ordinarily will not be granted relief under paragraph 6.

Technical Explanation 72.

This Court previously concluded that the above guidance from the Technical Explanation—at times referred to as the "principal purpose" test—provided the appropriate standard for evaluating whether someone is entitled to relief under Article 22(6), both for the IRS in the first instance and on judicial review. See Starr Int'l Co., Inc. v. United States ("Starr I"), 139 F. Supp. 3d 214, 229 (D.D.C. 2015).

### B. Starr's History, Corporate Structure, and Previous Relocations

Starr International was founded in 1943 by Cornelius Vander Starr. A.R. 44. Initially incorporated in the Republic of Panama, the company aimed at developing a worldwide network of insurance agencies that generated international business for U.S.-based insurance companies. A.R. 45. By 1970, Starr was headquartered in Bermuda, and had come to operate over 100 offices in 40 countries. Id. That same year, Starr entered into a transformative agreement with American International Reinsurance Company, Inc. ("AIRCO"), another insurance company founded by Vander Starr. In essence, Starr swapped its insurance businesses for stock in AIRCO. A.R. 45–46. At the same time, Starr reorganized. In a stated effort to keep the gains from the 1970 stock acquisition "within [Starr] for future investment and use and ultimate disposition to charity," Starr's voting shareholders created a new class of non-voting common

stock, with full residual rights to Starr's assets (now mostly AIRCO stock), and issued it to a charitable trust, whose ultimate beneficiary was a New York foundation. A.R. 47. Other 1970 amendments placed restrictions on the voting shareholders' use of the so-called "Restricted Surplus"—essentially, the economic gain that resulted from Starr's acquisition of AIRCO stock. See A.R. 46–48. In 1978, when AIRCO merged with AIG, the AIRCO stock became AIG stock, and Starr became AIG's largest shareholder. A.R. 48.

As the Government points out, Starr itself concedes, and a Southern District of New York court has discussed at length, see Starr Int'l Co. v. Am. Int'l Grp., Inc., 648 F. Supp. 2d 546 (S.D.N.Y. 2009), the factors motivating the vesting of the corporation's economic value in a charitable trust were not wholly charitable in nature (to say the least). Beyond seeking "to build value for eventual long range use and distribution to the common stock owners for charitable purposes," id. at 558, Starr's charity ownership structure was also designed to prevent the hostile takeover of AIG, id. at 555, and to fund compensation grants to AIG executives, id. at 571. See also A.R. 148–49 ("[T]he [Charitable] Trust was set up as [a] long-term arrangement with multiple goals. . . . . [A]mong the goals of the arrangement were the intentions to protect AIG from unwarranted hostile bids for change in control and to permit [Starr], as AIG's largest shareholder, to make incentive compensation grants . . . to AIG employees."). Motivations aside, Starr maintained this capital structure—voting shares with virtually no economic value, sitting atop valuable non-voting shares owned by a charitable trust—through the time period relevant here. As of 2007, Starr had 10,000 shares of non-voting common stock owned by Starr AG, the latest incarnation of Starr's charitable trust; 120 shares of voting stock owned by ten U.S. and two foreign individuals, largely current or former AIG executives; and 199 shares of "first preferred stock," owned by two U.S. individuals. A.R. 48–49.

Again, Starr was based in Bermuda at the time of its 1970 reorganization. It remained there until 2004, when it moved to Ireland. As with the motives underlying the corporation's capital structure, its reasons for this move are a matter of some dispute. In a July 2009 meeting with U.S. Competent Authority[2] officials, Starr—through counsel—represented that Bermuda was simply "too small of a place for a $20 billion charity," and that "Bermuda has political problems as well as a lack of skilled workers and professionals." A.R. 173. However, as the Government notes, there is abundant evidence that the move from Bermuda to Ireland was tax-motivated. In a 2005 *New York Times* article, lodged in the administrative record, a Starr voting shareholder and former AIG vice chairman explained that "Ireland taxes stock dividends at a 5 percent to 10 percent rate, compared with 30 percent in Bermuda, and that prompted the move to Dublin." A.R. 298. The Government also points to evidence brought out in the litigation between Starr and AIG, including a 2004 memo from Starr's then-president Michael Murphy, recommending that Starr move to Ireland for tax reasons, and a payment schedule for Starr's AIG dividends, showing that those payments surged in 2003. Def.'s Reply Supp. Cross-Mot. Summ. J. ("Def.'s Reply") 19. (The payments increased by $16 million from the year before; previous annual increases had ranged from $1 million to $7 million. Id.)

C. Starr's Move to Switzerland

In 2005, roughly a year after Starr relocated to Ireland, the company began planning for yet another move. The ostensible reason for this move—as Starr represented in a pre-filing presentation to the Competent Authority on December 6, 2007, and again in its December 21, 2007 request for treaty benefits—was that Irish law was not amenable to its charitable objectives.

---

[2] The U.S. Competent Authority is the official within the Treasury Department who is authorized to interpret provisions of our bilateral income tax treaties. The post is occupied by the IRS Deputy Commissioner for the Large Business and International Division.

See A.R. 23–42, 49.  In particular, Starr indicated that Irish law prohibited it from making

donations to charities that were not approved as exempt charities by the Irish Revenue

Commissioners.  A.R. 49.  This, combined with Starr's "related commitments to the Irish

authorities," purportedly placed "severe practical limitations on the amounts that could be

distributed to donees outside of Ireland."  A.R. 50.  Starr also said it wanted to amend the trust

deed so that the trustee—and not Starr itself—would have the power to direct the Trust's

investments and distributions, but the deed "could not effectively be amended under Irish law."

Id.

In a separate presentation and submission to the Competent Authority roughly eighteen

months later, however, Starr offered an additional (and wholly distinct) reason for its desire to

leave Ireland.  The company explained that "beginning in September 2005, [Starr had become]

the target of a number of fiercely contested lawsuits with AIG" regarding the proper ownership

of Starr's "most significant asset," its AIG shares.  A.R. 141–42; see also A.R. 152, 167 (July 23,

2009 presentation to the Competent Authority, explaining that "litigation risk was in fact an

immediate and pressing reason for [Starr's] move to Switzerland").[3]  Starr was worried that

those assets were not sufficiently insulated from litigation in Ireland, and so it began looking for

a "jurisdiction [that] would provide the most safety in light of the assault being mounted by

AIG."  A.R. 143.  Starr now maintains that these *two* broad concerns—flexibility for its charity,

_____

[3] Starr's initial request to the Competent Authority, in December 2007, had omitted any
reference to the AIG litigation.  This despite statements from Starr's general counsel, under
penalty of perjury, that the "facts submitted in support of this request . . . are true, correct and
complete," A.R. 66, and from Starr's outside counsel at Skadden, Arps that "[t]here are no
relevant domestic or foreign judicial or administrative proceedings that involve the taxpayer or
related persons," A.R. 65.  It is unclear whether these obvious omissions had any impact on the
Competent Authority's ultimate denial decision, or whether they ought to bear on the Court's
review of that decision.  See infra section III.C.

and protection for its assets—motivated its decision to relocate. See Pl.'s Mem. Supp. Cross-Mot. Summ. J. ("Pl.'s Cross-MSJ") 13–14.

But *where* should Starr move? The decisionmaking process Starr employed in answering that question is summarized in a "decision matrix," which both parties consider favorable evidence. A.R. 151. The chart appears to have been created in 2009, in an effort to summarize for the Competent Authority "the analysis the Voting Shareholders undertook in 2006." A.R. 144. It includes eleven rows, one for each combination of jurisdictions considered as possible homes for Starr and its charitable trust; and four columns, one for each criterion analyzed—namely, "Local Tax," "U.S. Tax," "Litigation Risk," and "Charities Regulation." A.R. 151. For example, the seventh row reads "Netherlands – Netherlands," indicating the possibility of relocating both Starr and its charitable trust to the Netherlands. Id. Reading from left to right, the row for "Switzerland – Switzerland," the jurisdictional combination ultimately selected, indicates a "Very Good" "Local Tax" environment, "Low" "Litigation Risk," and "Strong" "Charities Regulation." Id. The chart indicates that the "U.S. Tax" situation in Switzerland would be "Bad (absent 22(6))," i.e., without the discretionary exception to the Limitation on Benefits provisions at issue here. Id.[4]

According to Starr, its voting shareholders first determined to locate both Starr itself and the charitable trust in the same jurisdiction, as had been the arrangement for the previous 35 years. Keeping the two entities together would ostensibly provide "the strongest level of legal protection" in the event of a legal challenge. A.R. 143. That choice narrowed the eleven options to five: Bermuda, the United Kingdom, the Netherlands, Switzerland, and remaining in Ireland.

---

[4] Somewhat counterintuitively, Starr considered charity regulations to be "strong" when they were flexible, and "weak" when they were restrictive. See Hr'g Trans. 23–24.

A.R. 151.  Of these, after Bermuda, which had no bilateral tax treaty with the United States,

Switzerland offered Starr the least favorable U.S. tax situation (with a rating of "Bad").

Switzerland earned that rating because the tax breaks Starr would have received automatically in

the United Kingdom, the Netherlands, and Ireland, were available in Switzerland only by

application of Article 22(6)'s discretionary exception.  A.R. 54.  However, Starr claims to have

chosen Switzerland despite that rating because it was the only jurisdiction with both a "Low"

risk of litigation and "Strong" charities regulation.  See Pl.'s Cross-MSJ 15–16.  Starr began the

"migration" process in July 2006, and both Starr and Starr AG, the company's new charitable

arm, were Swiss residents by December 11, 2006.  A.R. 43, 50.  As had been the case previously,

Starr AG owned the corporation's non-voting common stock, which represented the lion's share

of the company's economic value.  A.R. 57.  Starr AG, in turn, was owned by a Swiss-resident

foundation, id., and Starr's residual beneficiary, in the event of dissolution, was the Starr

Foundation, based in New York.  A.R. 276.

      D.  Starr's Request for Treaty Benefits Under Article 22(6)

      Starr filed a request for treaty benefits under Article 22(6) on December 21, 2007.  A.R.

43.  In the request, Starr conceded that it was not entitled to benefits under any of Article 22's

mechanical tests.  A.R. 55.  However, it sought discretionary relief under paragraph 6 primarily

on the ground that its move to Switzerland was motivated by charitable considerations, not tax

concerns.  See A.R. 61 ("[Starr] chose to bear the risk of not obtaining relief under paragraph 6

of Article 22 because it believed that Switzerland was a better jurisdiction than available

alternatives from which to achieve the company's charitable objectives, even though it was less

desirable than the available alternatives from a U.S. withholding tax perspective.").  Starr also

argued that its request was "within the spirit of the objective criteria" of Article 22(2), which

confers treaty benefits on certain non-profit organizations. A.R. 61–62. Finally, Starr indicated that—given its Swiss residency, beneficial ownership by a Swiss non-profit, and majority-U.S. voting power—it was "not aware of any policy reason" to deny it treaty benefits. A.R. 62.

Starr's request prompted an extended, 34-month-long inquiry by the Competent Authority. During that period, Starr responded to numerous requests for further information, which included questions about the residencies of Starr's voting shareholders, A.R. 78; the company's associations with Panama, A.R. 80; the historical withholding rate applicable to the dividends Starr received on AIG stock, A.R. 85; and Starr's tax benefits under the U.S.-Ireland Treaty, A.R. 87. In June 2009, the Competent Authority informed Starr that it was "tentatively adverse" to the request. A.R. 153. Shortly thereafter, Starr's outside counsel prepared a detailed memorandum responding to the Competent Authority's concerns, which included the company's brief tenure in Ireland (suggestive of a tax motive) and its dubious charitable activities. A.R. 139–40. The memo attached the previously discussed "decision matrix," and explained—for the first time—that Starr had been in large part motivated by asset protection in moving to Switzerland. A.R. 141–42. Two days later, Starr gave a presentation to the Competent Authority with similar content. See A.R. 152–69.

On October 13, 2010, after further back-and-forth correspondence, the Competent Authority issued a final determination letter denying Starr's request for treaty benefits. A.R. 273–74.[5] The letter explained that, under the circumstances, the Competent Authority could not "conclude that obtaining treaty benefits was not at least one of the principal purposes for moving

---

[5] Although not in the administrative record, Starr's former outside counsel has attested that in November 2009, Starr was informed that the Competent Authority had tentatively decided in favor of granting benefits, but that in March 2010, after the appointment of a new Competent Authority, it was now tentatively adverse. See Declaration of Hal Hicks ¶¶ 7–9, ECF No. 48-2.

Starr's management, and therefore its residency, to Switzerland." A.R. 274. In support of that conclusion, the letter highlighted the following four considerations:

- [Starr]'s original incorporation in Panama and its management and control in Bermuda suggest the original corporate structure may have been developed with tax avoidance purposes in mind and/or with a purpose of avoiding the provision of information on [Starr]'s activities to the Internal Revenue Service;

- [Starr]'s re-location to Ireland and its movement of management out of Bermuda a relatively short time before the payment of dividends to [Starr] further suggests that [Starr] was seeking to avail itself of the treaty between the United States and Ireland to avoid U.S. tax on those contemplated dividends;

- The transitory nature of [Starr]'s location in Ireland, which may or may not have been intentionally transitory, and its subsequent movement to Switzerland further suggests its intention of organizing in a treaty jurisdiction to avail itself of a reduced rate of withholding on U.S. source dividends;

- [Starr] is largely controlled by U.S. individuals and such control is not in accord with recent development of U.S. policy on acceptable corporate ownership for [Limitation on Benefits] purposes.

A.R. 274.

E. <u>Administrative and Procedural History</u>

Meanwhile, because Starr was a Swiss resident by the start of 2007, and yet did not automatically qualify for U.S. tax benefits there, AIG withheld taxes at a rate of 30% on the dividends it paid to Starr. In 2007, the amount withheld was roughly $57.3 million, and in 2008, $42.3 million. Pl.'s Cross-MSJ 19. According to Starr, if the company had qualified for treaty benefits, those amounts would have been about $19.1 million and $21.2 million, respectively.

Id.[6]  In March 2010, while Starr's request for treaty benefits was still pending with the

Competent Authority, the company filed a claim for a tax refund of the difference between the

2007 tax amount actually withheld and the amount that would have been withheld had Starr

qualified for treaty benefits.  In February 2011, after the Competent Authority had issued a final

determination that Starr was *not* entitled to treaty benefits for the 2007 tax year, Starr filed a

similar refund claim for its 2008 taxes.  Id.  The IRS refunded the requested amount for 2008

(roughly $21.2 million), but not for 2007.  Id.  In a separate counterclaim, which is not the

subject of these cross-motions, the Government asserts that the 2008 refund was obtained

fraudulently and seeks its return.  See Def.'s Am. Answer & Counterclaim, ECF No. 9.

   Starr filed a tax-refund suit in this Court under 26 U.S.C. § 7422, seeking the 2007 refund

that the IRS had denied—largely on the grounds that the Competent Authority had abused its

discretion in denying treaty benefits.  The Court ultimately dismissed that complaint without

prejudice, permitting Starr to bring a claim under the Administrative Procedure Act ("APA").

See Starr I, 139 F. Supp. 3d 214, 219 (D.D.C. 2015); Starr Int'l Co., Inc. v. United States ("Starr

II"), No. 14-CV-01593, 2016 WL 410989 (D.D.C. Feb. 2, 2016).  Starr did so, alleging that the

Competent Authority's denial of treaty benefits to Starr was "arbitrary, capricious, an abuse of

discretion, and otherwise not in accordance with law" under the APA, and asking the Court for

"[a] judgment holding unlawful and setting aside" that denial.  Am. Compl., ECF No. 43.

   The parties have both moved for summary judgment, debating both what the proper

Article 22(6) standard is and whether it was reasonably applied.  The Court held a hearing on the

cross-motions.

---

   [6] The withholding rates under the Treaty are based in part on the percent of the U.S.-source company owned by the treaty beneficiary.  Starr's ownership of AIG was above 10% for 2007, and below 10% in 2008, triggering different withholding rates under the Treaty.

## II.    Legal Standards

When a court is tasked with reviewing final agency action under the APA, the summary judgment standard set forth in Federal Rule of Civil Procedure 56 does not apply.  Sierra Club v. Salazar, 177 F. Supp. 3d 512, 527 (D.D.C. 2016).  Instead, the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).  Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2). In making this determination, the statute further provides that "the court shall review the whole record or those parts of it cited by a party."  Id. at § 706.  This provision generally limits judicial review of agency action to the administrative record.  See Hill Dermaceuticals, Inc. v. FDA, 709 F.3d 44, 47 (D.C. Cir. 2013) ("[I]t is black-letter administrative law that in an APA case, a reviewing court "should have before it neither more nor less information than did the agency when it made its decision.") (quoting Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984)).

This standard of review under the APA is "highly deferential" and "presumes the agency's action to be valid."  Defs. of Wildlife v. Jewell, 815 F.3d 1, 9 (D.C. Cir. 2016) (citations omitted).  The reviewing court is "not to substitute its judgment for that of the agency." Ark Initiative v. Tidwell, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).  However, it must nonetheless ensure that "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  Id. (quoting State Farm, 463 U.S. at 43 (internal quotation marks omitted)).

Agency action is arbitrary and capricious, for example, if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." State Farm, 463 U.S. at 43. "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." Oceana, Inc. v. Pritzker, 24 F. Supp. 3d 49, 60 (D.D.C. 2014) (quoting San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n, 789 F.2d 26, 37 (D.C. Cir. 1986)).

## III.    Analysis

In moving for summary judgment, Starr raises arguments related to both the proper Article 22(6) *standard* and whether it was reasonably *applied*. Regarding the standard, Starr argues that Article 22(6) was meant to provide relief to anyone not "treaty shopping," and that treaty shopping always involves a third-country resident—i.e., a resident of a country *not* party to the relevant tax treaty. Because Starr was domiciled in Switzerland and its beneficial and voting ownership was (largely) either Swiss or American, the argument goes, the company could not have been a U.S.-Swiss Treaty shopper and therefore should have gotten relief under the treaty. Regarding the *application* of the standard, Starr counters that, even assuming the Article 22(6) standard lacks a third-country-resident requirement, the Competent Authority arbitrarily and capriciously relied on irrelevant facts and ignored material ones in reaching its determination. The Court evaluates each set of arguments in turn.

### A. The Proper Legal Standard for Awarding Treaty Benefits Under Article 22(6)

#### 1. *Starr's Third-Country-Resident Argument*

In holding that the Competent Authority's decision was judicially reviewable, this Court confirmed that the standard set forth in the Treaty's Technical Explanation governs. Starr I, 139 F. Supp. 3d at 227–28. That standard, to repeat, is as follows:

> The competent authority of a State will base a determination under [Article 22(6)] on whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention.

Technical Explanation 72. In rendering its denial decision, the Competent Authority quoted this standard, nearly verbatim, when it wrote that "the above-described circumstances make it impossible . . . to conclude that obtaining treaty benefits was not at least one of the principal purposes for moving Starr's management, and therefore its residency, to Switzerland." A.R. 274. Starr nevertheless argues that the Competent Authority's determination should be set aside because it identified and applied the wrong Article 22(6) standard.

Starr's argument begins with two uncontroversial premises. First, Starr notes that Article 22, including its discretionary provision, was developed to combat treaty shopping. There is abundant authority in support of that proposition, see Starr I, 139 F. Supp. 3d at 227 (Article 22 aims at "preventing companies from 'treaty shopping'"); U.S.-Swiss Treaty, Letter of Submittal ("Article 22 of the new Convention contains significant anti-treaty-shopping rules making its benefits unavailable to persons engaged in treaty shopping."); Technical Explanation 59 (explaining that Article 22 is designed to prevent treaty shopping), and the Government does not dispute it. Second, Starr correctly cites the Technical Explanation's discussion of treaty shopping, which describes the concept as "the use, by residents of third States, of legal entities

established in a Contracting State with a principal purpose to obtain the benefits of a tax treaty between the United States and the other Contracting State." Technical Explanation 59.

From there, Starr's assertions become more contentious. Starr argues that treaty shopping is not just a policy evil that Article 22 was designed to foil, but also the *legal standard* that the Competent Authority is required to apply when implementing Article 22(6). That is, Starr urges that entities must be awarded benefits so long as they are not "treaty shopping." <u>See</u> Pl.'s Cross MSJ 23–24.[7] Starr next applies a formalistic reading to the Technical Explanation's discussion of treaty shopping—paying special attention to its references to third-country residents—and arrives at its own treaty shopping definition, with two necessary conditions. Under Starr's definition, treaty shopping exists where: (1) "A Third-Country Resident . . . establish[es] or use[s] a Treaty Resident to make an investment in the United States," and (2) "A principal purpose behind the establishment or use of the Treaty Resident [is] to obtain treaty benefits for the Third-Country Resident." Pl.'s Cross-MSJ 24. This definition, in other words, adds a second prong to the Article 22(6) standard articulated in the Technical Explanation and confirmed by this Court: To be denied benefits, says Starr, an entity must not only have a "principal purpose" of obtaining treaty benefits, it must also be owned or established by a third-country resident.

Finally, Starr applies its version of the Article 22(6) standard to its own case, and—not surprisingly—the result is in Starr's favor. Starr reasons that "when the relevant transactions

---

[7] This was *not* what the Court held in its prior opinion. Rather, after quoting the "principal purpose" standard and explaining why that standard was justiciable, the Court referred *back* to that standard, in short-hand, as turning on "whether an applicant's principal purpose was treaty shopping." <u>Starr I</u>, 139 F. Supp. 3d at 229. At the time, Starr had not yet developed the formalistic definition of treaty shopping that it now advances, and the Court certainly did not intend to adopt that definition as an element of the Article 22(6) standard.

were complete, Starr, Starr AG [the charitable entity housing Starr's economic value], and the [Swiss foundation that owns Starr AG] were all located in Switzerland." Pl.'s Cross-MSJ 35. Plus, "more than 83% of Starr's Voting Shareholders were U.S. citizen individuals . . . and the ultimate beneficiary of the [Swiss] [f]oundation was another U.S. entity, the [New York-based] Starr Foundation." Id. Accordingly, because "the vast majority of the control and essentially all of the economic value of [Starr] . . . was held by entities or individuals resident in Switzerland or the United States (i.e., the parties to the U.S.-Swiss Treaty)," the third-country resident prong of Starr's proposed Article 22(6) standard could not be satisfied. Pl.'s Cross-MSJ 34.

Starr's argument is compelling on the surface, primarily because the Technical Explanation does appear to contemplate that treaty shoppers will be third-country residents. Upon closer analysis, however, Starr's proposed third-country resident test simply cannot be squared with Article 22's text, its structure, or its accompanying Technical Explanation. At bottom, the argument rests on a misconception—specifically, the conflation of two rather different types of residency. Before explaining why Starr's test cannot be reconciled with Article 22, the Court first addresses that misconception.

2. *Starr Misunderstands the Technical Explanation's Conception of "Residency"*

Starr is correct that Article 22's Technical Explanation includes numerous references to "third-country residents." In addition to the treaty shopping definition cited above, the Technical Explanation in several places expresses concern about the "misuse" of bilateral tax treaties by "residents of third countries." Technical Explanation 59; see also id. at 72. But these observations about the ubiquity of the "third-country resident" term merely prompt the following question: How exactly should "residency"—and correspondingly, the term "third-country resident"—be defined for the purpose of awarding or denying treaty benefits?

A close reading of the U.S.-Swiss Treaty and its Technical Explanation reveals two possible definitions. The first may be referred to as "on-paper" residency. Drawn from the text of the treaty itself, this definition is formalistic, and is based on certain objective indicators like "domicile, residence, nationality, place of management, place of incorporation, or any other criterion of a similar nature." Treaty art. 4(1)(a). This, of course, is the definition that applies anytime the word "resident" is used in the *text* of the Treaty—including in the text of Article 22. According to an on-paper conception of residency, a "third-country resident" would be an entity without any of the formalistic indicators listed in Article 4 of the Treaty—i.e., one whose "domicile, residence, nationality, place of management, place of incorporation, or any other criterion of a similar nature" is not located in a contracting state (and likely is located in a third country).

Although Starr never clarifies its own conception of "third-country resident," it is clear that the company largely relies on this on-paper definition when advancing its treaty shopping argument. For example, Starr references the "place of incorporation" of its parent and subsidiary entities when declaring that "[Starr], Starr AG . . . and the [Swiss foundation that owns Starr AG] were all located in Switzerland" during the relevant period. Pl.'s Cross-MSJ 35. The company cites its "place of management" when proclaiming that it "relocated its employees, operations, offices and board meetings entirely to Switzerland." Id. And Starr leans on the "nationality" of its voting shareholders, and perhaps their "domicile" and "residence," when it notes that "83% of [them] were U.S. citizen individuals" at the relevant time. Id. Starr's overriding point seems to be: All of the individuals and entities affiliated with us have *on-paper* connections to either Switzerland or the United States. That excludes us as treaty shoppers and entitles us to benefits.

This conception of residency, however, is generally not the one employed by the Technical Explanation's discussion of Article 22. That portion of the Technical Explanation begins by noting that a bilateral tax treaty is properly "a vehicle for providing treaty benefits to residents of the two Contracting states." Technical Explanation 59. "This statement," it continues, "begs the question of *who is to be treated as a resident of a Contracting State for the purpose of being granted treaty benefits*." Id. (emphasis added). Right away, then, the Technical Explanation signals that some on-paper residents will be "treated as . . . resident[s]" when it comes to awarding treaty benefits, and that others will not be; see also Technical Explanation 10 (on-paper residency "does not necessarily entitle [a] person to [treaty] benefits"). Rather, in the words of the Technical Explanation, Article 22 "authorize[s] a tax authority to deny benefits, *under substance-over-form principles*" to an individual or entity that does not have a genuine connection to the jurisdiction, even when it resides there *on paper*. Id. (emphasis added). As put succinctly by the Technical Explanation, the Article "effectively determines *whether an entity has a sufficient nexus* to the Contracting State *to be treated as a resident* for treaty purposes." Id. at 60 (emphasis added). An on-paper resident with "a sufficient nexus to the Contracting State" may be called a *bona fide* resident.

Given that Article 22's Technical Explanation employs a language of *bona fide* residency, it stands to reason that its references to "third-country residents" likely do not refer to entities with mere *on-paper* ties to third countries (and without on-paper ties to treaty countries). Instead, when the Technical Explanation refers to a "third-country resident," it should be read in light of "substance-over-form principles." In other words, the term is best understood as indicating an entity that is *not* a *bona fide* resident of a treaty country—that is, an entity *without* "a sufficient nexus to the Contracting State." Such a "third-country resident" would not

necessarily be a *bona fide* resident of any jurisdiction—and might actually reside on paper in a contracting state.

Despite the fact that *every* reference to "third-country resident" that Starr identifies appears in Article 22's Technical Explanation—which speaks in a language of *bona fide* residency—the company nevertheless applies an *on-paper* understanding of that term. It argues that its lack of on-paper ties to third countries, and the prevalence of its on-paper ties to Switzerland and the United States, are alone sufficient to entitle the company to treaty benefits. That formalistic approach, however, is anathema to the "substance-over-form principles" enunciated by Article 22's Technical Explanation. And as explained further below, it cannot be squared with the text or structure of Article 22.

### 3. If It Were Valid, Starr's Third-Country Rule Would Be a Mechanical Test; It Is Not

Perhaps the most conspicuous obstacle to the viability of Starr's proposed third-country-resident test is that it appears nowhere in Article 22. As discussed above, Article 22 is largely comprised of roughly a dozen objective, "mechanical tests." Even though these tests are animated by "substance-over-form principles" in that they aim to uncover whether an entity has a "sufficiently strong nexus" to the relevant jurisdiction, Technical Explanation 59, the tests themselves are nevertheless objective and formalistic. They are based on such factors as an entity's non-profit status, its ownership structure, and the *on-paper* residency of its owners and controlling shareholders. The tests vary in complexity, but implementing them requires little discretion: All are objective enough that tax professionals are able to predict with near-certainty whether an entity will qualify for benefits pursuant to the provisions.[8] For example, paragraph 1

---

[8] As if to illustrate the tests' objective, non-discretionary nature, Starr notes that the company "automatically" qualified for benefits under the similar mechanical provisions of the

of the Article affords treaty benefits to any on-paper resident of a treaty nation who is, among other things, "a recognized headquarters company for a multinational corporate group," a company "whose principal class of shares is primarily and regularly traded on a recognized stock exchange," and a "company, trust or estate" predominantly owned by persons entitled to treaty benefits under the paragraph.  Treaty art. 22(1).  And paragraph 3 provides that "[a] company that is a resident of a Contracting State shall . . . be entitled to" treaty benefits on dividends, interest, and royalties if "the ultimate beneficial owners of more than 30 percent of the aggregate vote and value of all of its shares are persons that are resident in that Contracting State [i.e., the state of on-paper residency], and [if it] would qualify for benefits under [certain of paragraph 1's provisions]."  Treaty art. 22(3)(a)(i).[9]

These mechanical tests are strikingly similar to Starr's proposed third-country resident test.  The latter is objective, rule-like, and mechanical, just like Article 22's tests—and yet Starr's test appears nowhere in the Article's text.  Consider how simple it would have been for

---

United States' tax treaties with Ireland, the United Kingdom, and the Netherlands.  Pl.'s Cross-MSJ 12, 16.

[9] That same test *also* requires that:

ii) the ultimate beneficial owners of more than 70 percent of all such shares are persons described in subparagraph i) and persons that are residents of member states of the European Union or of the European Economic Area or parties to the North American Free Trade Agreement that are described in subparagraph b); and

iii) the amount of the expenses deductible from gross income that are paid or payable by the company for its preceding fiscal period (or; in the case of its first fiscal period, that period) to persons that would not qualify for benefits under subparagraphs a), b), d), e), f) or g) of paragraph 1, is less than 50 percent of the gross income of the company for that period.

Treaty art. 22(3)(a).

the treaty drafters to include a provision along the following lines, among Article 22's laundry list of mechanical provisions: "[A] person that is a resident of a Contracting State [may claim treaty benefits] where such person . . . is a company, unless the predominant share of its aggregate vote or value is owned by persons who are not residents of a Contracting State." The drafters included no such rule. If treaty shopping, in the drafters' view, covered only those situations where an on-paper third-country resident owned or operated an on-paper treaty resident, that omission is very difficult to explain.

### 4. Starr's Test Clashes With the Nature of Article 22's Discretionary Provision and Its Overriding Purpose

Starr does not claim that its third-country test exists anywhere in Article 22's text, where one would expect it to be. Rather, Starr attempts to locate it in Article 22(6)'s discretionary provision. This is an awkward fit, for two main reasons.

*First*, it bears repeating that Article 22(6) is a *discretionary* provision. It confers broad discretion on the Competent Authority—so broad that the Government had at least a colorable argument that determinations under Article 22(6) are *entirely* unreviewable. See Starr I, 139 F. Supp. 3d 214. The text of provision merely provides that a person "may . . . be granted" treaty benefits if the Competent Authority "so determines after consultation with the competent authority of the other Contracting State." Treaty art. 22(6); see also Starr I, 139 F. Supp. 3d at 226 (describing the provision as "us[ing] the language of open-ended permission rather than command"). And yet, despite the discretionary nature of Article 22(6), Starr would have the Competent Authority and the Court read into the provision a mechanical rule that leaves no room for discretion. See Def.'s Sur-Reply Supp. Cross-Mot. Summ. J. ("Def.'s Sur-Reply") 4–5 (noting that, under Starr's rule, the Competent Authority would have "no discretion at all under Article 22(6) in any case not involving [on-paper] third-country ownership"); Pl.'s Sur-Reply

Supp. Cross-Mot. Summ. J. ("Pl.'s Sur-Reply") 8 (conceding that the Competent Authority would still "retain[] . . . the discretion to allow benefits [only where] a taxpayer is owned, maintained, or established by a Third-Country Resident").[10]  Under the test, if an entity lacks on-paper associations with on-paper third-country residents, that entity gets treaty benefits—period. It makes no sense to read this *non*-discretionary rule into a discretionary provision.

*Second*, the Technical Explanation is clear about the standards that govern Article 22(6) determinations.  Those standards are concerned not with the existence of third-country residency, but rather with an entity's *motivation* for choosing to establish *treaty-country residency*.  The Technical Explanation directs that an Article 22(6) determination should be based "on whether the establishment, acquisition, or maintenance of the person seeking [treaty] benefits . . . has or had as one of its principal purposes the obtaining of [treaty] benefits."  Technical Explanation 72.  At bottom, this "requires . . . a subjective determination of the taxpayer's *intent*."  Technical Explanation 59 (emphasis added); see also id. at 60 (describing the discretionary provision's objective as being the "same" as that of the mechanical tests: "to identify investors whose residence in the other State can be explained by factors other than a *purpose* to derive treaty benefits") (emphasis added).  In light of this clear guidance, it would be a strange result indeed if an entity *with* a "principal purpose" of obtaining treaty benefits was nevertheless entitled to benefits under Article 22(6).  But Starr's proposed test would in some circumstances require that very outcome.

As a final note regarding Article 22(6), the Court observes that the provision's stated goals and its discretionary nature go hand in hand:  Making a "subjective determination of . . .

---

[10] Because the Government cited previously unaddressed authorities in its Sur-Reply, the Court will grant Starr's Motion for Leave to File a Sur-Reply.

intent" is not an activity that lends itself to precise, *objective* rules. And yet this is exactly the kind of calculus that Starr would have the Court impose upon the Competent Authority via Article 22's *discretionary* provision. Such a reading would do violence to the structure and spirit of the Article.

### 5. *Starr's Test Would Result In a Cramped Conception of Treaty Shopping*

Starr's proposed test is not only at odds with Article 22 and the Technical Explanation, but it also depends on an unduly narrow definition of treaty shopping. Starr insists that "treaty shopping is a well-defined legal standard," which categorically excludes situations that do not involve on-paper third-country residents. Pl.'s Cross-MSJ 2. But, tellingly, the term is nowhere to be found in the U.S-Swiss Tax Treaty (or any bilateral tax treaty, for that matter). Rather, as indicated by the commentaries, legislative testimony, and agency guidance cited by the parties, there is a fair amount of imprecision surrounding the phrase. As used by these authorities, treaty shopping does frequently involve the participation of a third-country resident, but it need not. Rather, its essential characteristic is treaty abuse—manipulating on-paper residency for the purpose of obtaining treaty benefits.

For example, the Government cites commentary from the Organisation for Economic Co-operation and Development ("OECD") on its model tax treaty, which expresses concern regarding "the creation of usually artificial legal constructions, to benefit both from the tax advantages available under certain domestic laws and the reliefs from tax provided for in double taxation conventions." OECD Committee on Fiscal Affairs, *Model Double Taxation Convention on Income and on Capital* 47 (1977).[11] The commentary explains that such abuse would occur,

---

[11] According to one tax scholar, "[t]he OECD model conventions have constituted the principal bases for bilateral treaty negotiations among developed nations." Robert Thornton Smith, *Tax Treaty Interpretation by the Judiciary*, 49 Tax Law. 845 (1996).

"for example, if a person (*whether or not a resident of a Contracting State*), acted through a legal entity created in a State essentially to obtain treaty benefits which would not be available directly to such person."  Id. (emphasis added).  Treaty abuse would also occur, according to the commentary, if an individual "transferred his permanent home [from one Contracting State] to the other Contracting State, where [capital] gains were subject to little or no tax."  Id.  Clearly, these examples do not turn on a third-country participant, and yet the OECD's more current commentary describes this treaty abuse as "the problem commonly referred to as 'treaty shopping.'"  OECD Committee on Fiscal Affairs, *Model Tax Convention on Income and on Capital* C(1)-26 (2014).

Similarly, the parties have cited and discussed testimony regarding the U.S.-Swiss Treaty, presented before the Senate Committee on Foreign Relations, from former Deputy Assistant Treasury Secretary Joseph H. Guttentag.  See *Bilateral Tax Treaties and Protocol: Hearing Before the S. Comm. on Foreign Relations*, 105th Cong. 354, at 11 (1997).  Mr. Guttentag explains that one

> major objective of U.S. tax treaty policy is to . . . prevent abuse of the treaty by persons who are not *bona fide* residents of the treaty partner.  This abuse, which is known as "treaty shopping," can take a number of forms, but its general characteristic is that a resident of a third state that has either no treaty with the United States or a relatively unfavorable one establishes an entity in a treaty partner that has a relatively favorable treaty with the United States.

Id.  Guttentag elaborates that, while treaty shopping "general[ly]" involves a third-country resident, it "can take a number of forms," and it is primarily concerned with treaty abuse "by persons who are not *bona fide* residents of the treaty partner."  Id.

Starr's definition of treaty shopping, by contrast, would narrow the concept to such an extent that even some persons who are not *bona fide* residents of a treaty nation—persons who lack a "sufficient nexus" to either contracting state—would be entitled to benefits.  Of course,

that is likely Starr's reason for proposing such a standard, since it largely concedes that it was not a *bona fide* resident of Switzerland or the United States at the relevant time.[12]

Before proceeding to Starr's remaining arguments, some qualifications are in order. First, the Court does not mean to suggest that an entity's on-paper residency (and that of the individuals it associates with) is irrelevant to its *bona fide* residency. Surely, in exercising its discretionary judgment under Article 22(6), it would be reasonable for the Competent Authority to consider Starr's lack of affiliations with on-paper third-country residents in evaluating the company's *bona fide* connections to treaty states. There is simply no *per se* Article 22 rule, however, requiring the Competent Authority to reach such a determination. Second, clearly any bilateral tax treaty is intended to benefit the legitimate residents of the two signatory nations. Accordingly, it would also have been permissible as a matter of *policy*, but was not required as a

---

[12] Rather than defending its *bona fide* connections to Switzerland, Starr focuses its energies on asserting that *bona fide* residency is a "made-up" requirement, with "no basis in the record or the law." Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") 19. That claim is indefensible, given that the term "*bona fide* residency" is mere shorthand for the sufficient nexus inquiry, which is outlined in Article 22's Technical Explanation. In any event, defending its *bona fide* Swiss residency would be an uphill battle in light of the company's admissions that, for most of the period between 2003 and 2008, Starr had only one salaried employee, who followed the company from Bermuda, to Ireland, and finally to Switzerland. A.R. 90–91.

Despite its being controlled by U.S. citizens, Starr as an *entity* does not claim to be a *bona fide* resident of the United States, either. Indeed, under the Treaty, it does not appear to be possible for an entity to have *bona fide* residence in a jurisdiction without also having on-paper residence in that jurisdiction. Because Starr and all of its subsidiary entities reside on paper in Switzerland, it could therefore not establish *bona fide* residency in the United States. More to the point, because the Treaty aims to provide taxation benefits to residents of one contracting state on income sourced in the *other*, establishing residency in the United States under the U.S.-Swiss Treaty would not benefit Starr, which seeks treaty benefits on U.S.-based income.

matter of law, for the Competent Authority to consider an argument that Starr's majority-control by U.S. citizens should counsel in favor of awarding it benefits under Article 22(6).[13]

In any event, the point remains that it is difficult to square Starr's version of the Article 22(6) standard with Article 22's text, structure, and accompanying Technical Explanation. The Court therefore reaffirms that the proper standard for determining benefits under Article 22(6) is "whether the establishment, acquisition, or maintenance of the person seeking [treaty] benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of [treaty] benefits." Technical Explanation 72. The Competent Authority clearly applied this standard. A.R. 274.

B. The Competent Authority's Application of the Article 22(6) Standard

In a separate line of argument, Starr contends that the Competent Authority's determination was arbitrary and capricious even assuming that it correctly framed the Article 22(6) standard. These arguments fault the Competent Authority's *analysis*, i.e., the manner in which it applied the "principal purpose" standard. At a broad level, the arguments make two points: first, that the Competent Authority overlooked essential information that would have compelled a different result; and second, that the Competent Authority heeded irrelevant or incorrect facts, and thereby drew unreasonable conclusions. The Court now turns to each argument.

---

[13] Starr in fact *did* make that argument before the Competent Authority. See A.R. 62 (Starr arguing in its 2007 submission that it is "not aware of any policy reason to exclude [from treaty benefits] a company with Swiss tax residency, more than 80% of whose voting power is owned by U.S. citizens"). By contrast, Starr first advanced its third-country-resident test in this litigation.

### 1. Whether Certain, Purportedly Key Evidence Required a Contrary Result

Starr argues that certain evidence shows, incontrovertibly, that obtaining tax benefits under the Treaty was not one of its principal purposes in relocating to Switzerland.[14]  Starr emphasizes that its "U.S. tax position could not have been improved by relocating to Switzerland because the most favorable withholding tax rate [it] could expect on dividends from AIG under the U.S.-Swiss Treaty was the same rate Starr was entitled to under the U.S.-Irish Treaty."  Pl.'s Cross-MSJ 37.  Because that equivalent, favorable rate was automatic in Ireland but discretionary in Switzerland, "the only change to [Starr]'s treaty position resulting from the move from Ireland to Switzerland was a reduction in certainty that [Starr] would be entitled to a reduction in the withholding tax rate," meaning that tax benefits could not have been one of its principal purposes in relocating.  Id. at 38.

This argument, however, assumes a much narrower inquiry than is called for by the Technical Explanation, which directs the Competent Authority to determine "whether the establishment, acquisition, or maintenance" of a company in the relevant jurisdiction had a principal purpose of obtaining treaty benefits.  Technical Explanation 72.  Notably, the Explanation does not direct the Competent Authority to ask merely what made a company's current jurisdiction more favorable than its previous one—although that might be part of the analysis—but rather why a company chose to "establish" or "maintain" itself where it did.  In other words, here the question was not simply why Starr chose Switzerland over Ireland, but rather why Starr chose Switzerland over *any other jurisdiction* where it might have moved.

---

[14] Starr argues that a principal purpose must be at least "a first purpose among equals," Pl.'s Cross-MSJ 36, and not simply an "important" purpose, Def.'s Reply 12.  The Court finds the distinction inconsequential as applied here.  For the sake of argument only, then, the below discussion assumes Starr's more stringent definition.

Furthermore, the language employed by the Technical Explanation, along with analogous guidance, suggests that the Competent Authority should engage in an historical, totality-of-the-circumstances inquiry in evaluating a company's reasons for choosing a jurisdiction. See Technical Explanation 72; Treas. Reg. § 1.884-5(f)(2) (branch profits tax regulations, permitting the IRS to consider "the continuity of the historical business and ownership of the foreign corporation"). Presumably, that would include a consideration of Starr's *history* of moves, not just the company's most recent relocation.

Relatedly, Starr argues that the "decision matrix" conclusively demonstrates that obtaining treaty benefits was not of principal concern to the company when it decided to relocate to Switzerland. See Pl.'s Cross-MSJ 39–40. Just as Switzerland offered a less favorable regime than did Ireland, it also offered a less favorable tax regime than the other final contenders on Starr's list of potential new jurisdictional homes. In particular, the Netherlands and the United Kingdom guaranteed Starr the low dividends withholding rate that it had in Ireland, and that it could only attain in Switzerland under the discretionary exception. In Starr's view, that shows tax motives were not a chief concern when it made the move to Switzerland.

There are numerous problems with this argument. As an initial matter, the decision matrix itself is suspect evidence: It appears to have been created in 2009, years after the move to Switzerland, and in an effort to convince the Competent Authority that seeking treaty benefits was not a principal motive behind Starr's move. See A.R. 144. Second, even assuming the matrix accurately summarizes Starr's earlier decisionmaking process, it hardly shows that tax benefits were low on the company's priority list. In fact, as the Government points out, Starr's acknowledgment that "U.S. Tax" was one of four key criteria that the company analyzed in deciding on a jurisdiction shows that it "constituted [a] principal consideration[]" in Starr's

calculus. Def.'s Mem. Supp. Cross-Mot. Summ. J. ("Def.'s Cross-MSJ") 21. Third, it is unclear

how Starr arrived at its list of five finalist jurisdictions, but presumably that narrowing process

would have some bearing on whether treaty benefits were a "principal" factor in its ultimate

selection. (For instance, if Starr's most important criterion in selecting a list of five jurisdictions

was a favorable tax relationship with the U.S., then it would not be surprising if Starr focused

more on other factors in making its final cut.) Finally, Switzerland was rated as "Bad" for U.S.

taxes on the decision matrix. But it was definitely better in that regard than at least one of the

other finalists (Bermuda), and if the company had been afforded discretionary relief—which

Starr certainly seems to indicate was expected—then Switzerland would have tied for first place

in that category with the other jurisdictions.

For the above reasons, neither Starr's decision matrix, nor its decision to leave Ireland in

favor of Switzerland, inevitably leads to the conclusion that treaty benefits were not a "principal"

concern for the company when it chose to relocate. Rather, if the matrix is accepted as reliable

evidence of Starr's decisionmaking process, it actually reveals that "U.S. Tax" considerations

were a top priority in selecting Starr's new home. For these reasons, this evidence does not

render the Competent Authority's determination arbitrary and capricious.

> 2. *Whether the Competent Authority's Analysis Rested on Irrelevant or Incorrect Determinations*

In addition to faulting the Competent Authority for what it did *not* analyze, Starr takes

issue with what *was* analyzed, and how. The company argues that "each of the [Competent

Authority]'s justifications is either unsupported by the record or patently unreasonable." Pl.'s

Cross-MSJ 40.

<u>The Competent Authority's Analysis Regarding the Treaty's Silence on Entities with Starr's Particular Structure</u>

During the period when its request for treaty benefits was under review, Starr argued to the Competent Authority that the Treaty's failure to specifically afford benefits to companies with Starr's particular structure—that is, for-profit companies owned by charitable entities—was an inadvertent oversight. The argument was apparently grounded in a comparison with other bilateral U.S. tax treaties, many of which do include specific provisions affording relief to companies with such structures. In its determination letter, the Competent Authority stated that it could not reach "a definitive conclusion" on Starr's position. A.R. 273. It elaborated that "it is not possible for us to conclude whether [a Limitation on Benefits] provision like that found in the [U.S.-Netherlands Tax Treaty] or the [U.S.-United Kingdom Tax Treaty], which . . . may have applied to permit [Starr] treaty benefits if included in the U.S.-Swiss Treaty, was not included in the U.S.-Swiss treaty intentionally or by casual omission." <u>Id.</u> In its briefing, Starr summarizes what it characterizes as "strong evidence supporting the interpretation that the negotiators for the U.S.-Swiss Treaty did not consciously exclude [companies like Starr] from the automatic qualifying provisions in Article 22," and it faults the Competent Authority for failing to definitively reach that conclusion. Pl.'s Cross-MSJ 43. Then Starr calls this whole "justification . . . irrelevant." <u>Id.</u>

This argument is a nonstarter. Starr essentially asks the Court to find that the Competent Authority acted arbitrarily and capriciously because it failed to definitively conclude that the text of the U.S.-Swiss Treaty should be overwritten by text in *other* bilateral tax treaties, and because there is no legislative history to the contrary. But "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text." <u>Starr I</u>, 139 F. Supp. at 226 (quoting <u>Abbott v. Abbott</u>, 560 U.S. 1, 10 (2010)). So at the very least, it was not unreasonable for the Competent

Authority to decline to read into the treaty a provision that was not there. Moreover, it bears emphasizing that the Competent Authority reached no conclusion one way or the other on the matter, and therefore the analysis appears not to have grounded its final determination. It is therefore misleading for Starr to characterize it as a "justification," although perhaps accurate to call it "irrelevant." Pl.'s Cross-MSJ 43.

      ii.   <u>Whether the Four "Circumstances" Cited by the Competent Authority Were Inaccurate or Irrelevant to the Article 22(6) Standard</u>

The Competent Authority cited four sets of "facts and circumstances" that it considered "troubling" and that undergirded its principal-purpose determination: (1) Starr's initial incorporation in Panama and later residence in Bermuda, which suggested previous aims of tax avoidance; (2) Starr's move to Ireland shortly before major AIG dividend payments; (3) Starr's brief stay in Ireland, which "may or may not have been intentionally transitory"; and (4) Starr's majority control by U.S. individuals. A.R. 273–74. Starr argues that "[n]one of the[se] circumstances relate to treaty shopping," and that they are "unsupported by the record." Pl.'s Cross-MSJ 44. Again, these arguments are not persuasive.

As for the first three "circumstances," which relate to Starr's previous history of residence and incorporation, Starr does not challenge their factual accuracy. Rather, Starr seems to suggest that because they predate its move from Ireland to Switzerland, they are irrelevant to the Article 22(6) inquiry. But as previously discussed, there is nothing in the Article 22(6) standard that limits the historical lens through which the Competent Authority may make a "principal purpose" determination. <u>See</u> <u>supra</u> section III.B.1. Rather, it stands to reason that a company's past jurisdictional moves—including its willingness to relocate in the interest of obtaining tax benefits—might shed light on its most recent relocation. It was reasonable, not capricious, for the Competent Authority to consider such historical data. Starr also takes issue

with the *inferences* the Competent Authority drew from such facts—most significantly, that the move to Ireland was tax-motivated. But as recounted above, there was abundant evidence to support that conclusion. See supra section I.B.

Starr also challenges the Competent Authority's conclusion that Starr's control by U.S. individuals "is not in accord with recent developments of U.S. policy on acceptable corporate ownership for [Limitation of Benefits] purposes." A.R. 274. The Government explains that this statement was "in reference to the [IRS's] discovery of abusive structures whereby U.S. individuals invest in the United States by structuring transactions through tax havens, including treaty countries, which impose little or no tax on such arrangements." Def.'s Reply 37. In Starr's view, "[a]llowing the [Competent Authority] to apply legal standards that were not identified in the treaty itself or in the accompanying guidance would be tantamount to granting the [Competent Authority] unfettered discretion in deciding whether to grant treaty benefits." Pl.'s Cross-MSJ 47. This greatly overstates the case. Article 22(6) bestows significant discretion on the Competent Authority to sift treaty shoppers from non-treaty shoppers, and that surely includes permission to take stock of current legal standards and policies.[15]

  iii. Whether the Competent Authority Improperly Relied on a "Narrow-Miss"
       Understanding of Article 22(6)

After concluding that one of Starr's principal purposes for relocating to Switzerland was obtaining treaty benefits, the Competent Authority went on to state: "Moreover, in our view, Article 22(6) of the U.S.-Swiss Treaty was designed to provide relief to a taxpayer that can make

---

[15] Moreover, both the Treaty and the Technical Explanation suggest the legal standards "in effect at the time the Convention is being applied, [and] not the law as in effect at the time the Convention was signed," should control in interpreting the treaty's undefined terms. Technical Explanation 9; see also Treaty art. 3(2) (providing that "any term not defined [in the treaty] shall . . . have the meaning which it has under the laws of that State concerning the taxes to which the Convention applies").

a strong case that, while coming within the spirit of an available [Limitation on Benefits] provision, it narrowly misses the mechanical tests associated with that provision." A.R. 274. Starr notes that "the U.S.-Swiss Technical Explanation and the U.S.-Swiss Treaty do not mention or suggest a 'near miss' requirement," and that even if such a requirement existed, "[Starr] would satisfy it." Pl.'s Cross-MSJ 48. As the Government explains, however, the Competent Authority in making this statement was likely responding to arguments that Starr itself had made during the review process. See Def.'s Reply 36. More to the point, the statement was made as an aside, after the Competent Authority had applied the "principal purpose" standard in order to reach its determination. Whether the "near-miss" concept accurately describes the scope of Article 22(6) is therefore beside the point.

## IV. Conclusion

In light of the above discussion, the Court sees nothing arbitrary or capricious in the Competent Authority's finding that "at least one of the principal purposes for moving Starr's management, and therefore its residency, to Switzerland" was to obtain tax benefits under the U.S.-Swiss Tax Treaty. A.R. 274. By applying the correct legal standard to a host of indisputably relevant facts, the Competent Authority satisfied its obligations under the APA to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Ark Initiative, 816 F.3d at 127.

Accordingly, as specified in the accompanying Order, the Court will grant the

Government's motion for summary judgment and deny Starr's cross-motion.[16]


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:   August 14, 2017

---

[16] Starr argues that the Chenery rule precludes the Government from raising certain allegedly *post hoc* justifications for the Competent Authority's denial decision. See SEC v. Chenery Corp., 332 U.S. 192, 196 (1947) (A "simple but fundamental rule of administrative law" is that a court reviewing agency action "must judge the propriety of such action solely by the grounds invoked by the agency."). In particular, Starr argues that the Court should not consider the following: (1) Starr's alleged failure to disclose its pending litigation with AIG; (2) Starr's supposedly non-charitable purposes; and (3) Starr's purported failure to disclose its actual motivations for various relocations. Pl.'s Cross-MSJ 50. Because the Court has found that the Competent Authority's denial decision was reasonable without the aid of these arguments, there is no need to reach the question of whether they are barred by Chenery.

Similarly, because the Court has not relied in any way on the email attached to the Government's Sur-Reply, see Def.'s Sur-Reply, Ex. C, which forms the basis for Starr's Motion to Strike or Reopen Discovery, the Court will deny that motion as moot.